DA 12-0569

IN THE SUPREME COURT OF THE STATE OF MONTANA

2013 MT 357

BRESNAN COMMUNICATIONS, LLC,

        Plaintiff and Appellee,

  v.

STATE OF MONTANA,
DEPARTMENT OF REVENUE,

        Defendant and Appellant.

APPEAL FROM:    District Court of the Thirteenth Judicial District,
                    In and For the County of Yellowstone, Cause No. DV-10-1312
                    Honorable Susan P. Watters, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

                David R. Stewart, Courtney Jenkins (argued), Teresa G. Whitney, Special
                Assistant Attorney Generals, Montana Department of Revenue, Legal
                Services Office; Helena, Montana

        For Appellee:

                Robert L. Sterup (argued), Kyle Anne Gray, Shane P. Coleman, Holland &
                Hart LLP; Billings, Montana

                                Argued and Submitted:  September 25, 2013
                                         Decided:  December 2, 2013

Filed:

                              _____
                                       Clerk

Justice Brian Morris delivered the Opinion of the Court.

¶1 The State of Montana Department of Revenue (Department) appeals the order of the Thirteenth Judicial District, Yellowstone County, that determined that the Department lacked authority to impose retroactive assessments on Bresnan Communications, LLC (Bresnan). The Department also appeals the separate findings of fact, conclusions of law, and order that determined that Bresnan owns exclusively class eight cable television system properties under § 15-6-138(l)(k), MCA. We reverse and remand.

¶2 We address the following issues on appeal:

1. *Whether the District Court properly determined that Bresnan owned exclusively class eight property?*

2. *Whether the District Court properly concluded that the Department lacked authority to impose retroactive property tax assessments?*

## PROCEDURAL AND FACTUAL BACKGROUND

¶3 Bresnan challenged the Department's decision to tax Bresnan as a single entity rather than allowing Bresnan to apportion unilaterally its assets among tax classifications. Bresnan is a Delaware Limited Liability Company that operates in Montana. Bresnan purchased the cable television network infrastructure in Montana that is at the center of this dispute in 2003.

¶4 Bresnan's 2003 network was typical of cable systems. The "headend" of that network received and broadcasted data that Bresnan chose. The headend broadcasted data over the "trunk cable," the industry name for the networked cable system that connected Bresnan's data feed to each customer's neighborhood. Once the data reached a customer's neighborhood, the "feeder cable" transmitted data throughout the neighborhood. Each

2

individual customer had a "drop cable" that connected the feeder cable to the customer's home. The drop cable connected to the customer's "terminal equipment." The terminal equipment, commonly known as the set-top box, interpreted which data to play on a television.

¶5 Bresnan began to upgrade the network's infrastructure to include new services shortly after the purchase. Bresnan sought to integrate services beyond basic television programming. Bresnan wanted to bundle expanded cable programming (cable), on-demand video services, high-speed internet data services (internet), and voice-over internet protocol telephony services (VoIP). Bresnan labels these services its "Triple Play" package. The upgrades necessary to include these services altered Bresnan's network from its 2003 form.

¶6 Bresnan's expert accounting and valuation report describes Bresnan's "significant investment in system engineering, costly new equipment, upgraded distribution plant, and installation labor" in order to expand its cable programming. Bresnan improved its satellite receiver dishes, installed signal combiners, optical laser transmission equipment, and added optical fiber between the headend and feeder cable distribution nodes. Bresnan invested in video-on-demand servers and upgraded distribution node equipment. Bresnan also distributed new set-top boxes to customers.

¶7 Bresnan made additional investments to prepare its system for internet services following its cable upgrade. Bresnan made business arrangements to provide connection to the internet and upgraded its physical system to affect the addition of internet services. Physical upgrades included data switches in each headend to interface with the internet

3

connections in Seattle and Denver, local data servers in main headends, and a "Cable Modem Termination System" (CMTS).

¶8 The CMTS allowed Bresnan to combine the internet data with the cable data into a single electrical signal for transfer over Bresnan's system. Bresnan also provided cable modems to subscribers who purchased internet service. To achieve the transfer of internet service to its customers, Bresnan used both the CMTS and the recently-installed signal combiners, optical fiber between headends and distribution nodes, and existing drop cables.

¶9 Bresnan upgraded its network further to provide VoIP residential telephone services. Bresnan contracted with Net2Phone, a joint venture partner, to effect this upgrade. Net2Phone provided most of the necessary capital and software to bring about residential VoIP capabilities. Bresnan provided use of the CMTS to combine the residential VoIP data with the cable and internet data into a single electrical signal for transfer over Bresnan's network. Bresnan used both the CMTS and the recently-installed signal combiners, optical fiber between headends and distribution nodes, and existing drop cables to achieve the transfer of residential VoIP service to its customers.

¶10 Bresnan also engaged in the "[s]ystem [h]ardening" process for its network after upgrades to enable residential voice services. System hardening included further physical changes to Bresnan's network. Specifically, Bresnan installed battery backups and other unspecified equipment to identify and reduce interference for residential VoIP service. System hardening reduced interference that specifically would have affected the data and VoIP traffic on its network.

¶11 Bresnan made further upgrades to enable commercial VoIP. These upgrades included new switches in select headends and data servers for commercial subscriber voicemail services. Bresnan used the CMTS to combine the commercial VoIP data with residential VoIP, cable, and internet data into a single electrical signal for transfer over Bresnan's network. Bresnan used both the CMTS and the recently-installed signal combiners, optical fiber between headends and distribution nodes, and existing drop cables to achieve the transfer of commercial VoIP service to its customers.

¶12 Bresnan lastly began to provide the same terminal equipment to customers in 2010, without consideration of which services the customer had purchased from Bresnan. This new terminal equipment provided an integrated experience to customers. Regardless of which services the customer had purchased from Bresnan, all data arrived into a single piece of terminal equipment. The single terminal equipment processed that data and delivered the appropriate service to the customer.

¶13 Although Bresnan functionally had bundled its Triple Play services for consumers, Bresnan segregated each service for taxation purposes. Montana imposes an excise tax upon voice services, such as Bresnan's telephony operations. Section 15-53-128 *et seq.*, MCA. Montana imposes no excise taxes upon cable television or high speed internet. Section 15-53-128 *et seq.*, MCA. Bresnan paid separate franchise fees to local governments for the right to install its cable television system in public rights of way. Bresnan needed to pay no franchise fees, however, for high speed internet or telephony.

¶14 The Montana legislature amended the Montana tax code in 1999 to include language central to this dispute. The amendment specifically incorporated "telecommunications

5

services" into the tax code when it created an assessment classification for "telecommunications services companies." Section 15-6-156(1)(d), MCA (2001). The Department would for the first time assess centrally allocations of "telecommunications services companies" under the new amendment. Section 15-6-156(1)(d), MCA (2001). Comments at the hearings on the bill show that the bill's sponsor intended to provide a tax decrease from the pre-1999 assessment and taxation rates for "the assets of telecommunications" in future telecommunications developments. Mont. Sen. Tax. Comm., Hearing on HB 174, 1999 Legis., Reg. Sess. 11-13 (Apr. 12, 1999).

¶15 Montana's administrative rules require the Department to value centrally reported property through the unit method of valuation. Admin. R. M. 42.22.111 (2011). Unit valuation considers the market value of the company as a functional whole instead of the value of individual components. Whether a taxpayer uses local filing, as compared to central filing, dictates the method that the Department uses to value property.

¶16 Bresnan unilaterally apportioned company assets when Bresnan made its tax reports in order to segregate its property. Bresnan used centralized, statewide reporting for its voice operations. Bresnan included roughly 10% of company assets in its voice operation tax declaration. Bresnan reported voice operations as "Bresnan Digital Services, LLC" doing business as "Montana Telephony" from 2007 to 2009. Bresnan also centrally reported its microwave satellite operations as a portion of the same 10% of company assets. The Department had classified Bresnan's voice operations as class thirteen property from 2007 to 2009 because the voice operations were "allocations of [a] centrally assessed

6

telecommunications and services compan[y]." The class thirteen classification resulted in a 6% centralized assessment on Bresnan's voice property.

¶17 Bresnan included the remaining 90% of its assets in locally reported cable and internet properties assessments as "Bresnan Communications, LLC." Local communities assessed Bresnan's cable and internet properties from 2007 to 2009. Local assessments resulted in a 3% local assessment on cable and internet properties. The Department knew of Bresnan's decision to report its cable and internet properties for local assessment as class eight properties from 2007 to 2009.

¶18 The Department audited Bresnan in December 2008 for tax years 2007 and 2008. The Department determined upon completion of the audit in August 2009 that Bresnan should report its property as a single entity rather than as three separate entities. The Department informed Bresnan that Montana law required the Department to assess Bresnan centrally as one unit, and to classify Bresnan's property under class thirteen as allocations of a centrally assessed telecommunications services company.

¶19 The Department issued revised assessments for Bresnan for tax years 2007, 2008, and 2009 following the audit. The Department's revised assessments centrally assessed all of Bresnan's property under class thirteen. The Department submitted the revised assessments to Bresnan. Bresnan paid parts of the assessments under protest.

¶20 The Department similarly assessed Bresnan centrally on May 26, 2010, as one unit for the 2010 tax year. The 2010 assessment subjected all of Bresnan's Montana properties to class thirteen central assessment at a 6% tax rate. Section 15-6-156(4), MCA. The reclassification increased Bresnan's tax burden from $1,711,365 in tax year 2009 to

7

$7,337,692 in tax year 2010. Bresnan filed this declaratory judgment action in response on July 28, 2010.

¶21 Bresnan sought to prevent the Department from issuing revised assessments of Bresnan for tax years 2007, 2008, and 2009. Bresnan also sought to prevent the Department from issuing any other revised assessments. Bresnan additionally sought a declaration that the Department illegally had assessed all of Bresnan's property as class thirteen property. Bresnan further asked the District Court to require the Department to refund taxes that Bresnan had paid under protest. Bresnan lastly challenged the legality of the Department's method of assessment for the 2010 tax year.

¶22 The District Court granted Bresnan's motion for summary judgment on the Department's ability to issue retroactive assessments in a written order on September 26, 2011. The District Court conducted a bench trial on October 24, 2011. The District Court concluded that Bresnan owned class eight properties. The District Court directed the Department to refund with interest the payments that Bresnan had made under protest. The District Court also vacated the Department's retroactive assessments of Bresnan. The Department appeals.

**STANDARD OF REVIEW**

¶23 We review for clear error a district court's findings of fact. *Roland v. Davis*, 2013 MT 148, ¶ 21, 370 Mont. 327, 302 P.3d 91. Clear error exists if substantial, credible evidence fails to support the findings of fact, if the district court misapprehended the evidence's effect, or if we have a definite and firm conviction that the district court made a

8

mistake. *Roland*, ¶ 21. We review for correctness a district court's conclusions of law. *Roland*, ¶ 21. We review de novo a district court's ruling on a motion for summary judgment. *Bailey v. State Farm Mut. Auto. Ins. Co.*, 2013 MT 119, ¶ 18, 370 Mont. 73, 300 P.3d 1149.

**DISCUSSION**

¶24 *Whether the District Court properly determined that Bresnan owned exclusively class eight property?*

¶25 We first address whether Montana law allows the Department to classify Bresnan's property in class eight or class thirteen. Montana law defines class eight properties to include "cable television systems." Section 15-6-138(1)(k), MCA. Montana taxes class eight properties at 3%. Section 15-6-138(3), MCA. Class thirteen properties comprise "allocations of centrally assessed telecommunications services companies." Section 15-6-156(1)(d), MCA. Montana taxes class thirteen property at "6% of its market value." Section 15-6-156(4), MCA.

¶26 These statutory definitions pose the question of whether Bresnan's property should be classified as a "cable television system" or a "telecommunications services company." The District Court concluded as a matter of law that Bresnan's property qualified as a "cable television system." The District Court evaluated Bresnan's "[o]ne-way transmission of video programming," "set of closed transmission paths," and "system that receives and amplifies the signals broadcast by one or more television stations" to reach its conclusion. The District Court relied both on the legislature's definition of a "cable television system," and the language in Bresnan's Montana Cable Television Franchise Agreements that

9

matched the language in the Federal Cable Act. Bresnan fit the definition of a cable television system under these factors.

¶27   The District Court further concluded as a matter of law that "Bresnan's addition of voice and data services did not change the character of its cable television systems." The District Court relied upon the Department's apparent failure to "reconcile the necessity of Franchise Agreements for Bresnan to deliver its video programming" with the Department's contention that "Bresnan, as a whole, is a telecommunications company." The District Court applied a use test to measure Bresnan's "PPE [property, plant, and equipment], bandwidth, subscribers, or revenue" to "conclude that Bresnan owns property subject to [c]lass [e]ight property taxation."

¶28   The Department challenges the District Court's focus on Bresnan's physical attributes to the exclusion of the use and productivity of Bresnan's property. The Department alleges that the District Court erroneously considered only "a portion of [Bresnan's] use and productivity." The Department argues that the District Court should have evaluated Bresnan's classification based upon Bresnan's use of all of its property and the productivity that results from that use. *Chicago, M. & St. P. Ry. Co. v. Powell Cnty.*, 76 Mont. 596, 599, 247 P. 1096, 1097 (1926); *Wheir v. Dye*, 105 Mont. 347, 73 P.2d 209 (1937). The Department further takes issue with the District Court's lack of "analysis on the physical attributes or use and productivity of Bresnan's internet property."

¶29   The District Court relied heavily upon our decision in *Omimex Canada, Ltd. v. State Dep't of Revenue*, 2008 MT 403, 347 Mont. 176, 201 P.3d 3. In *Omimex*, we considered whether a natural gas company's property fell within § 15-6-141(1)(b), MCA (2007).

10

*Omimex*, ¶ 17. Section 15-6-141(1)(b), MCA (2007), encompasses "allocations for centrally assessed natural gas companies having a major distribution system in this state." Omimex's lack of a major distribution system within Montana excluded it from § 15-6-141(1)(b), MCA (2007). *Omimex*, ¶ 26.

¶30    "[C]able television systems" comprise class class eight property. Section 15-6-138(1)(k), MCA. "[A]llocations of centrally assessed telecommunications services companies" comprise class thirteen properties. Section 15-6-156(1)(d), MCA. Neither classification statute contains the requirement that a taxpayer have "a major distribution system in this state," similar to the provision in § 15-6-141(1)(b), MCA (2007), at issue in *Omimex*. This physical attribute requirement in *Omimex*—in the form of a major distribution system—remains unique for purposes of property tax classification statutes. Not surprisingly, *Omimex* represents the sole case where we have determined that the physical attributes of a taxpayer's property alone govern property tax classification. *Omimex*, ¶ 26.

¶31    The District Court's analysis focused upon a physical attribute of Bresnan's property—the transfer of electrical data signals. Physical attributes do not represent the standard that Montana courts use to classify property. The District Court's focus upon the physical attributes of Bresnan's network confines the Department's ability to classify Bresnan's entire property in proportion "to its use, its productivity, its utility, [and] its general setting in the economic organization of society." *Yellowstone Pipe Line Co. v. State Bd. of Equalization*, 138 Mont. 603, 621, 358 P.2d 55, 64 (1960). The physical attributes of Bresnan's property *and* the productivity that results from the use of that property represent the proper metric to classify Bresnan. *Wheir*, 105 Mont. at 354-55, 73 P.2d at 213.

11

¶32 Bresnan argues that we should uphold the District Court's conclusion regardless because Bresnan qualifies as a "cable television system" under the definition of a rural cooperative utility cable television system, "that receives and amplifies the signals broadcast by one or more television stations." Section 35-18-102, MCA. Bresnan cites to its cable franchise agreements with Montana cities to bolster its position. Bresnan also correctly identifies that both parties' experts agree that Bresnan operates a cable television system. The Department concedes "that Bresnan's systems are capable, at least in part, of these utilities."

¶33 This definition of a "cable television system" fails to capture all of the uses to which Bresnan puts its network. Nothing restricts the use and productivity of Bresnan's network to the delivery of an electrical data signal only for cable television. Bresnan's expert report from Dr. Walter Stanley Ciciora describes cable as the "predominant," but not exclusive, "use of even the most technologically advanced cable television systems today." Bresnan's accounting and valuation report describes a "multi-million dollar commitment to enhance[] [cable] that required a significant investment in system engineering, costly new equipment, upgraded distribution plant, and installation labor." That same report describes additional investments "needed to provide data services" and "needed to provide V[o]IP residential telephony services," as well as the "incremental cost of enabling commercial V[o]IP services." Dr. Ciciora concluded that "[m]ost of [Bresnan's] cable television systems are technologically advanced, providing cable television programming, and high speed data and voice."

¶34 Bresnan altered its network from one with the limited ability to broadcast only cable in 2003, to the multi-service capable network at issue in this litigation. Bresnan's argument that its network operates exclusively a "cable television system" denies the obvious fact of the actual use and productivity of Bresnan's upgraded network. This upgraded network, combined with Bresnan's attendant property, has expanded Bresnan's operation beyond a "cable television system" as defined by any section of the Montana code, including § 15-6-138(1)(k), MCA.

¶35 Various provisions within Title 15 and the administrative rules of Montana explain what constitutes a telecommunications services provider for property tax purposes. We must construe statutes that address the same subject matter and that are consistent with one another to ensure that all statutes have effect. *Mountain W. Farm Bureau Mut. Ins. Co. v. Hall*, 2001 MT 314, ¶ 23, 308 Mont. 29, 38 P.3d 825.

¶36 "[A]llocations of centrally assessed telecommunications services companies" comprise class thirteen properties. Section 15-6-156(1)(d), MCA. The definitions section of Title 15 defines the parameters of a telecommunications services company. A "telecommunications services provider" offers retail telecommunications services. Section 15-53-129 (14), MCA. "Retail telecommunications," in turn, involve "the two-way transmission of voice, image, data, or other information over wire, cable, fiber optics, microwave, radio, satellite, or similar facilities that originates or terminates in this state and is charged to a customer with a Montana service address." Section 15-53-129(10)(a), MCA.

¶37 The administrative rules of Montana clarify that a "telecommunications service provider" includes "a telecommunication services company or a person providing retail telecommunication services as provided in 15-53-129, MCA." Admin. R. M. 42.22.101(31) (2011). The administrative rules further define "telecommunications for *property tax purposes*" as "the transmission of information between or among points specified by the user. The transmission must be without change in the form or content as sent and received. The transmission includes all related services associated with providing the information by the telecommunication service provider." Admin. R. M. 42.22.101(30) (2011) (emphasis added). We construe these statutes and regulations on the same subject matter so that all statutes have effect. *Mountain W. Farm Bureau*, ¶ 23.

¶38 Title 15 and administrative rules, taken together, confirm that "for property tax purposes," Admin. R. M. 42.22.101(30) (2011), a class thirteen "telecommunication services compan[y]," § 15-6-156(1)(d), MCA, "provid[es] retail telecommunication services." Admin. R. M. 42.22.101(31) (2011). A "telecommunications services provider," § 15-53-129(14), MCA, in turn, offers "[r]etail telecommunications." Section 15-53-129(10)(a), MCA. Bresnan provides "voice," "data," and "other information" over "fiber optic" cable to its customers. Section 15-53-129(10)(a), MCA. Data and voice are "related services associated" with Bresnan's original network that historically provided only cable. Admin. R. M. 42.22.101(30) (2011).

¶39 Bresnan's transmissions terminate in the homes of "customer[s] with a Montana service address" in twenty counties. Section 15-53-129(10)(a), MCA. Bresnan uses its network to provide cable, to provide data, and to provide voice services. Section 15-53-

14

129(14), MCA. Bresnan's activities constitute "retail telecommunications" and "telecommunications" under both Title 15 and the administrative rules. Section 15-53-129(10)(a), MCA; Admin. R. M. 42.22.101(30) (2011).

¶40 The Montana legislature has seen fit to define a class thirteen telecommunication services company in a manner that encompasses distribution networks whose owners use the capacity of that network to provide voice, cable, and data electrical signals to subscribers over that single distribution system. Sections 15-53-129 (14), -129(10)(a), MCA. We decline to parse the number and type of electrical data signals that Bresnan transmits over its network or the allocations of the network's physical elements when the use and productivity of the network as a whole fits the statutory definition of a telecommunications network. An analysis of the use and productivity of Bresnan's entire network results in the inescapable conclusion that Bresnan uses a single transmission line to deliver three separate services. This analysis imparts the Department with the authority to classify Bresnan's property accordingly under class thirteen as a telecommunication service. *Powell Cnty.*, 76 Mont. at 599, 247 P. at 1097; *Wheir*, 105 Mont. at 347, 73 P.2d at 213.

¶41 The legislature's exemption of certain properties from class thirteen further supports this outcome. The expression of one thing in a statute implies the exclusion of another. *Omimex*, ¶ 21. The legislature explicitly excluded from class thirteen any class five property owned by an organization that provides telecommunications services. Section 15-6-156(2)(f), MCA. This express exclusion of class five property implies that the legislature intended to include all other property that a telecommunications services provider owns in class thirteen. Section 15-6-156(2)(f), MCA. If the legislature had intended to exclude class

15

eight "cable television systems" from class thirteen, the legislature could have added the additional language of "and under 15-6-138 [class eight]" to the class thirteen exemptions. Section 15-6-156 (2)(f), MCA. The legislature did not do so.

¶42 To limit Bresnan's classification to a "cable television service" fails to achieve the purpose of Montana's taxation classification statutes. Statutory definitions and administrative guidelines taken together, and in the absence of an applicable exclusion, make clear that Bresnan's use and productivity fits the definition of a "telecommunication services provider." Bresnan, as a result, remains subject to assessment under class thirteen.

¶43 The Dissent argues that the Department's failure to value Bresnan's property in different classes "disregards the basic premise of our property classification system." Dissent, ¶ 65. Nothing in the classification statutes requires, however, that the Department apportion Bresnan's property among Montana's various property tax classifications. This Court previously has defined "allocation" for taxation purposes as "the process of attributing to the taxing state the value of a portion of an interstate system for tax purposes." *Yellowstone Pipe Line Co.*, 138 Mont. at 612, 358 P.2d at 60. The class thirteen definition of "allocations of centrally assessed telecommunications services companies" requires only that the Department consider all of Bresnan's property located within Montana for taxation purposes. Section 15-6-156(1)(d), MCA; *Yellowstone Pipe Line Co.*, 138 Mont. at 612, 358 P.2d at 60. This decision allows the Department to address properly "an administrative matter within its broad discretion." *State v. Hornstein*, 2010 MT 75, ¶ 16, 356 Mont. 14, 229 P.3d 1206.

16

¶44 The Dissent further argues that the overwhelming use of Bresnan's property takes the form of "one-way transmission that receives and amplifies television broadcast signals." Dissent, ¶ 67. The Department's audit of Bresnan revealed, however, that very little of Bresnan's use of its system involves exclusively cable television that relies on one-way transmissions that receive and amplify broadcast signals. In fact, most of Bresnan's system, as currently used, has the capacity to support the two-way transmission of electrical data signals. The operation of a "telecommunications services compan[y]," involves the two-way transmission of electrical data signals. Section 15-6-156(1)(d), MCA. The Department's audit of Bresnan confirms that "Bresnan upgraded their equipment and lines to two-way transmission capacity, fiber optic in most cases, to offer many of their advanced services that are available today."

¶45 Our determination that the Department appropriately classified the use and productivity of Bresnan's property under class thirteen instead of class eight requires us to analyze the assessment of class thirteen property. The District Court determined that central assessment did not apply to Bresnan. The District Court exempted Bresnan from central assessment based upon its determination that Bresnan qualified as a class eight "cable television system." The District Court further reasoned that the central assessment statute, § 15-23-101, MCA, "omits any reference to cable television system[s]." A class thirteen classification, conversely, denotes by its terms "centrally assessed telecommunications services companies." Section 15-6-156(1)(d), MCA. Bresnan's qualification as a telecommunications service company requires us to determine whether class thirteen

17

classification of Bresnan would be appropriate under the "centrally assessed" element of §15-6-156(1)(d), MCA.

¶46    Montana law requires the Department to assess centrally "property owned by a corporation . . . operating a single and continuous property operated in more than one county." Section 15-23-101(2), MCA. Properties that enjoy a unity of ownership and devotion to a single use qualify as single and continuous properties. *W. Union Tel. Co. v. State Bd. of Equalization*, 91 Mont. 310, 322-23, 7 P.2d 551, 552-53 (1932). "Single and continuous" properties are functionally integrated over a wide area and enjoy a unity of use and management. *W. Union Tel. Co.*, 91 Mont. at 322-23, 7 P.2d at 552-53.

¶47    Bresnan operates a single and continuous network in the twenty Montana counties where Bresnan delivers three services. Bresnan operates in an integrated fashion. Bresnan's customers pay one bill for the purchase of all three services. Bresnan manages its operations from the Network Operations Center in Billings. Customers use a single piece of terminal equipment. Bresnan owns class thirteen property in those locations where Bresnan operates a single transmission line to deliver three services to customers. Bresnan fits the statutory definition of a property that the Department must assess centrally. Section 15-6-156(1)(d), MCA.

¶48    *Whether the District Court properly concluded that the Department lacked authority to impose retroactive property tax assessments?*

¶49    We next address whether the Department possessed authority to issue revised assessments for Bresnan's property for tax years 2007, 2008, and 2009. The District Court determined that § 15-8-601(b), MCA, controlled its analysis. The District Court interpreted

18

our revised assessment case law to allow reassessment only in circumstances where there had been a clerical error or a ministerial mistake. The District Court determined that our case law foreclosed reassessments "made to comport with a change in assessor judgment" to avoid impermissible prejudice to the taxpayer.

¶50 The District Court reasoned that the Department's shift away from Bresnan's prior income statement and balance sheet to a centralized assessment represented a shift in assessor judgment. The District Court concluded that the "change in appraisal judgment" placed the Department's reassessment "outside the definition of an—'erroneous assessment'" allowed under § 15-8-601, MCA. The Department argues that it "lacked the information necessary to make a determination on central assessment before its audit of Bresnan." The Department contends that it "performed unit valuations on Bresnan for tax years 2007-2009" upon discovery of "the information necessary to make a determination on central assessment."

¶51 The Department points out that none of our revised assessment cases "involve[d] centrally assessed property." The authority to issue revised assessments is critical because appraisers must "annually test whether a property requires central assessment." The Department contends that restraint on its ability to "exercise judgment to determine whether the property requires central assessment" would render the Department unable to perform its duty under Montana law.

¶52 We have defined the contours of revised assessments only twice. We determined first in *Evans Products Co. v. Missoula Cnty.*, 201 Mont. 337, 342, 654 P.2d 523, 526 (1982), that "a clerical error falls under the plain language meaning of 'erroneous assessment' as it is

19

used in section 15-8-601, MCA." *Evans Products*, 201 Mont. at 342, 654 P.2d at 526. We further noted that "[t]he bulk of authority and prior Montana case law suggest that appraisal, the setting of market value, is an integral part of the taxation process." *Evans Products*, 201 Mont. at 343, 654 P.2d at 526. This Court analyzed revised assessments more recently in *Kruse v. Cascade Cnty.*, 244 Mont. 126, 796 P.2d 568 (1990). We clarified in *Kruse* that "[p]roperty which has not been fully taxed according to appropriate tax procedures may be properly reassessed." *Kruse*, 244 Mont. at 129, 796 P.2d at 570.

¶53    Neither *Evans Products*, nor *Kruse*, specifically examined revised assessments in the context of property that must be assessed centrally. *Evans Products* and *Kruse* make clear, however, that § 15-8-601, MCA, allows the Department to reassess property that has not been taxed fully according to appropriate tax procedures. *Evans Products*, 201 Mont. at 343, 654 P.2d at 526; *Kruse*, 244 Mont. at 129, 796 P.2d at 570. Unit valuation involves a specific type of appraisal. Appraisal represents an "integral part of the taxation process." *Evans Products*, 201 Mont. at 343, 654 P.2d at 526. The Department logically possesses the authority under § 15-8-601, MCA, to reassess property subject to central assessment when the Department determines that such property has not been taxed fully according to appropriate tax procedures.

¶54    The Department must "discover" property that has escaped assessment before it has authority to issue a revised assessment. Section 15-8-601(b), MCA. Many taxpayers in Montana, including Bresnan, self-report their assets into different assessment classes. A more thorough look at the taxpayer's property through an audit constitutes the only vehicle

20

for the Department to "discover" property that has escaped assessment when the taxpayer self-reports. The Department completed its audit of Bresnan in 2009.

¶55    The Department's audit revealed that Bresnan should be classified properly as a class thirteen "telecommunication services provider." This reclassification resulted in Bresnan being subject to central assessment. The audit further revealed past improper classification of property on the part of Bresnan. This improper classification apparently arose through Bresnan's self-reporting of its assets. The historic improper classification of Bresnan's property represents property that escaped full taxation according to appropriate tax procedures. Section 15-8-601(b), MCA.

¶56    The Department's audit determined that Bresnan's allocations of percentages of its property as cable, data, or voice failed to "appropriately represent the operations of the segments." The property that Bresnan had classified as "telecommunications services" property contained only that property dedicated exclusively to voice service. Bresnan had classified the remaining lion's share of its property as "cable television services." This substantially larger portion included any property that involved cable or data in any way. The audit found that "[u]sing this methodology [Bresnan's] [c]able operations are overstated and [t]elephony is understated."

¶57    Kory Hofland (Hofland) worked as the unit manager of centrally assessed and industrial properties at the Department. Bresnan deposed Hofland. Hofland described property that had not been taxed fully. Hofland identified that Bresnan had limited its property that would be assessed centrally by "only reporting [to class thirteen] property of a receiver of [Bresnan's] services that only had telephony." Hofland explained that "[i]f that

21

recipient subscribed to telephony and [i]nternet, they weren't [reported] in the telephony portion." Hofland similarly explained that "[i]f they subscribed to telephony and cable, they weren't in [Bresnan's telephony reporting]." Hofland expressed further concerns about Bresnan's lack of backup to "audited financial data" with regard to Bresnan's historic reporting arrangement.

¶58 The Department's audit of Bresnan and Hofland's testimony indicate that the audit of Bresnan enabled the Department to discover property that had not been taxed fully according to appropriate tax procedures. The Department reclassified Bresnan as a class thirteen telecommunication services provider, subject to central assessment, in order to value the full property taxes due on Bresnan's property. Section 15-8-601, MCA, grants the Department the authority to issue a revised assessment of Bresnan in order to capture the value of property that has not been taxed fully according to appropriate tax procedures.

¶59 Bresnan challenges the Department's decision to issue a revised assessment as the result of a "change in assessor judgment." Evidence in the record directly contradicts Bresnan's argument. The Department's discovery and subsequent reclassification arose from the audit's revelation of inaccuracies in Bresnan's self-classification. We decline to characterize the discovery of property that has not been taxed fully according to appropriate tax procedures due to a misclassification on the taxpayer's part as a mere "change in assessor judgment." We will not presume Bresnan's bad faith in self-allocation. We similarly will not tie the Department's hands simply because it discovered the improper classification through an audit when the taxpayer self-reports.

¶60    We reverse the decision of the District Court.  We remand and direct the District Court to enter a judgment consistent with this opinion.

/S/ BRIAN MORRIS

We concur:

/S/ MIKE McGRATH
/S/ PATRICIA COTTER
/S/ MICHAEL E WHEAT
/S/ BETH BAKER


Justice Jim Rice, dissenting.

¶61    The Court eschews any attempt to analyze the extensive record evidence and instead relies heavily on the presumption that because Bresnan provides some telecommunications services, nearly all of its property can be assessed by the Department under class thirteen.  I believe that the Court has disregarded the plain wording and intent of Montana's property classification statutes and failed to properly apply the "physical attributes" and "use and productivity" tests.

¶62    The proper application of these tests results in companies being taxed under multiple property classes, depending on the use of their property.  The District Court extensively analyzed and entered findings about this system, including the property tax classifications applied to companies such as Montana Dakota Utilities, Northwestern Energy, Avista Corporation, Portland General Corporation, and Yellowstone Valley Electric Cooperative, all of which are taxed in multiple classes.  More specifically, regarding the telecommunications

23

industry, the District Court found that "[t]elecommunications companies that report for central assessment under Class Thirteen also report and are assessed locally for certain of their Montana property under Class Eight, including Sprint Nextel, Qwest, and CenturyTel." The court found that the Cable & Communications Corporation, a company that provides cellular telephone and cable television services, "reports its cellular telephone properties for central assessment under Class Thirteen while reporting its cable television properties for local assessment under Class Eight."

¶63 Regarding Bresnan, the District Court found from the extensive evidence presented that "[o]ver 97% of Bresnan's Montana bandwidth is used exclusively for the one-way transmission of video programming." Further, "[s]tate-wide, 917 [of Bresnan's] channels were devoted exclusively to the one-way transmission of video programming, while 26 channels were devoted to voice/data, and 28 channels were used for Video-on-demand (which also is one-way video transmission)."1 To summarize its lengthy findings, the court found that Bresnan's properties "primarily were and are used to provide the one-way transmission to subscribers of video programming." The District Court's findings are supported by substantial evidence and have not been overturned. The Court's approach is simply to assume that because Bresnan has telecommunications capabilities, the Department is authorized to tax nearly all of its property under class thirteen.

¶64 Turning to the statutes, we are to start with the principle that "[t]ax statutes must be construed in favor of the taxpayer." *Omimex*, ¶ 25. The statutes make clear that holding

commercial property that facilitates the two-way transmission of voice, image, and data qualifies an entity as a telecommunications services company. *See* § 15-53-129(10)(a), MCA ("Retail telecommunications" means "the two-way transmission of voice, image, data, or other information over wire, cable, fiber optics, microwave, radio, satellite, or similar facilities that originates or terminates in this state"). Indeed, the Court correctly notes that by definition, "[a] 'telecommunications services provider' offers retail telecommunications services." Opinion, ¶ 36 (citing § 15-53-129(14), MCA). Because Bresnan holds some two-way telephony and internet property, it operates, in part, as a telecommunications company. However, the Court gets sidetracked by then deducing that § 15-6-156(1)(d), MCA, allows the Department to classify nearly all of Bresnan's property under class thirteen, Opinion, ¶ 40, when in reality, only some of that property—a very small fraction of it—actually facilitates the two-way transmission of voice, image, and data.

¶65　The statute does not require that *all property* of a telecommunications services company is to be taxed under class thirteen. By allowing the Department to tax Bresnan's one-way property under class thirteen, the Court disregards the basic premise of our property classification system—different types of property are taxed in different classes. *N. Pac. Ry. v. Sanders Co.*, 66 Mont. 608, 615-16, 214 P. 596, 599 (1923) (determining "[c]lassification must be based upon substantial distinctions which make one class really different from another."); *see* § 15-6-101(2), MCA. The Legislature made a conscious decision to tax cable television systems at a 3% rate under class eight, § 15-6-138(1)(k), MCA, and

---

1 "Analog electronic communication long has been measured in "bandwidth" in units of MegaHertz ("MHz"). The Federal Communications Commission ("FCC") historically defined a "channel" as

25

telecommunications services property at a 6% rate under class thirteen, § 15-6-156(1)(d), MCA. We should not permit the Department to ignore this distinction.2 Consistent with the classification system as a whole and the duty to construe the statutes in favor of the taxpayer, only property that actually meets the definition of telecommunications services property should be so classified. Thus, the statutes require an apportionment of taxes between Bresnan's two-way transmission property—which demarcates a telecommunications services company in the first place—and its predominately one-way cable television property.

¶66    The Court's determination that the "legislature intended to include all other property that a telecommunications services provider owns in class thirteen," Opinion, ¶ 41, does great harm to not only Bresnan, but potentially to the property tax system as a whole. This holding runs directly counter to the property classification structure and to the manner in which telecommunications companies—and other companies—are actually taxed. For example, class nine property includes "allocations for centrally assessed natural gas distribution utilities . . . ." Section 15-6-141(1)(d), MCA. Under the Court's analysis, this language would necessarily incorporate all properties of natural gas distribution utilities into this class and tax them at a 12% rate, *see* § 15-6-141(2). Clearly, this is not the case, as other utility property, such as "air and water pollution control equipment," is classified under class five and taxed at a rate of 3%. *See* § 15-6-135(1)(b), (5).

---

six (6) MHz."
2  The Court argues that by classifying nearly all of Bresnan's property under class thirteen, the Department is simply addressing "an administrative matter within its broad discretion." Opinion, ¶ 43.  However, we have also held that an agency's implementation of a statute must be "consistent and not in conflict with the statute" and must "effectuate the purpose of the statute." *Mont. Trout Unlimited v. Mont. Dept. of Nat. Resources and Conserv.*, 2006 MT 72, ¶ 36, 331 Mont. 483, 133 P.3d 224 (citation omitted) (discussing an agency's rulemaking authority).

¶67 Moreover, the Court fails to apply our use and productivity test with any precision. During oral argument, Bresnan analogized its property to a superhighway consisting of 800 lanes. 796 of these lanes are filled bumper-to-bumper with trucks travelling one way, 24 hours per day, 365 days per year. The remaining 4 lanes contain cars travelling two ways. These cars do not move all the time, only sporadically. The trucks in this analogy represent Bresnan's one-way cable television property. The cars represent Bresnan's two-way telecommunications services property. Accordingly, after making extensive findings, the District Court determined that the overwhelming use of Bresnan's property is one-way transmission that receives and amplifies television broadcast signals. The Court's wholesale reliance on the Department's audit does not render these findings clearly erroneous—M. R. Civ. P. 52(a)(6) requires that we "give due regard to the trial court's opportunity to judge the witnesses' credibility." Both parties' experts testified that Bresnan operates a cable television system. Class eight property includes "cable television systems," § 15-6-138(1)(k), MCA, which by definition "receive[] and amplif[y] the signals broadcast by one or more television stations." Section 35-18-102, MCA.

¶68 The Court sidesteps the hard work of analyzing the record evidence, declining "to parse the number and type of electrical data signals that Bresnan transmits over its network or the allocations of the network's physical elements . . . ." Opinion, ¶ 40. However, nothing could be more indicative of a network's use than the number and type of data signals actually being transmitted over it. In sum, the Court claims to be classifying property on the basis of use, Opinion ¶¶ 31, 34, 40, but ultimately fails to do so by allowing the Department to place nearly all of Bresnan's property into class thirteen.

¶69 Bresnan has been changing the services it provides from cable television to telecommunications services. Consistent therewith, Bresnan has been reporting those changes, listing properties that are utilized for telecommunications services under class thirteen. However, the Department of Revenue got up one morning and decided to flip the entire company into class thirteen, thereby increasing Bresnan's taxes by an incredible 329% overnight, from $1.7 million to $7.3 million, even though the overwhelmingly predominant use of Bresnan's property is for class eight purposes. This disincentive for companies to expand their telecommunications services was not created or intended by the Legislature, but is the work of the Department. It should be called highway robbery—perhaps the first case of information superhighway robbery by the tax authorities.

¶70 I dissent.

/S/ JIM RICE

Justice Laurie McKinnon joins in the dissenting Opinion of Justice Rice.

/S/ LAURIE McKINNON