# FILED

May 2 2013

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA


DA 12-0247

IN THE SUPREME COURT OF THE STATE OF MONTANA

2013 MT 119

BRENDA BAILEY AND J. STANLEY BAILEY, JR.,

        Plaintiffs and Appellants,

  v.

STATE FARM MUTUAL AUTOMOBILE INSURANCE
COMPANY, MARK OLSON AND DOES 1-3,

        Defendants and Appellees.

APPEAL FROM:    District Court of the Ninth Judicial District,
In and For the County of Glacier, Cause No. DV-09-18
Honorable Laurie McKinnon, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

        Michael J. George, Lucero & George, L.L.P., Great Falls, Montana

        For Appellee:

        Robert F. James, Jordan Y. Crosby, Ugrin, Alexander, Zadick
& Higgins, P.C., Great Falls, Montana

Submitted on Briefs: February 27, 2013

Decided: May 2, 2013

Filed:

_____
Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1    Brenda Bailey and J. Stanley Bailey, Jr. (the Baileys) appeal from an order of the Ninth Judicial District Court, Glacier County, granting summary judgment to State Farm and Mark Olson (Olson) on the Baileys' claims that State Farm and Olson negligently failed to secure underinsured motorist (UIM) coverage for the Baileys. We reverse the District Court's entry of summary judgment in favor of State Farm and Olson, and remand for further proceedings.

## ISSUES

¶2    The Baileys raise the following two issues on appeal:

¶3    1. Did the District Court err in granting summary judgment when it found no genuine issues of material fact with respect to the duty of State Farm and Olson to procure UIM coverage for the Baileys?

¶4    2. Did the District Court err in granting summary judgment by failing to recognize and impose a duty arising in negligence beyond a duty to procure requested coverage?

## FACTUAL AND PROCEDURAL BACKGROUND

¶5    On October 19, 2006, a drunk driver crossed the highway centerline and collided head-on with the Baileys' vehicle. The Baileys sustained very serious injuries in the accident. Stan was flown to Harborview Medical Center in Seattle and remained a patient there for five months. Brenda spent a significant amount of time hospitalized in Kalispell and Cut Bank. Brenda remains wheelchair bound as a result of her injuries. The Baileys incurred medical expenses in excess of $1,000,000.

¶6     The Baileys moved from Oregon to East Glacier, Montana, in March 1998. The Baileys had been State Farm customers for many years. On April 3, 1998, the Baileys went to the Mark Olson State Farm Agency in Cut Bank, Montana, to transfer their Oregon State Farm policy to Montana. Insurance agent Nola Peterson Softich (Softich) assisted the Baileys. The Baileys specifically recalled presenting their Oregon State Farm insurance cards to Softich and requesting that the same coverage they carried in Oregon be transferred to Montana. The Baileys also maintain that they requested full coverage.

¶7     Softich completed a computerized insurance application for each of the Baileys' two vehicles. Each application listed twelve types of coverage and displayed a "Yes" or "No" next to each coverage to indicate whether that coverage was selected. The State Farm policies sold to the Baileys in Montana contained liability coverage limits of $250,000 per person and $500,000 per occurrence for bodily injury, $100,000 for property damage liability, $5,000 in medical payments coverage, and uninsured motorist (UM) coverage limits of $100,000 per person and $300,000 per occurrence. On both applications, Softich entered a "No" next to the UIM coverage. After Softich filled out the applications, Stan signed both applications. The application contained the following language directly above the signature line:

> I apply for the insurance indicated and state that (1) I have read this application, (2) my statements on this application are correct, (3) statements made on any other applications on this date for automobile insurance with this company are correct and are made part of this application, (4) I am the sole owner of the described vehicle except as otherwise stated, and (5) the limits and coverages were selected by me.

3

¶8     Stan testified in his deposition that he typically did not read any insurance documents because he relied on his agent to provide him with the important information. Brenda recalled receiving insurance cards from State Farm, but did not recall reviewing any policies or other information from State Farm. State Farm and Olson maintained that the Baileys received new insurance cards and renewal notices listing the various coverages twice every year.

¶9     Although Softich had no independent recollection of her initial interaction with the Baileys, she testified that it was her habit and practice to always review the "ACHUW" coverages with new customers. "ACHUW" stands for:  A – liability; C – medical payment; H – emergency towing; U – uninsured motorist; and W – underinsured motorist. Softich claimed that UIM coverage must have been offered to the Baileys. Softich also testified that she never advised customers to lower their UM or UIM coverage. Olson admitted that he did not know whether the Baileys were offered UIM coverage, but his staff is supposed to go through every coverage. The Baileys had no specific recollection of whether the "ACHUW" coverages were discussed when they met with Softich.

¶10     It is undisputed that the Baileys' State Farm automobile insurance policy obtained in Montana did not match their previous policy from Oregon. The Baileys' Oregon policies provided the following coverages:  (1) bodily injury liability, $300,000 per person/$500,000 per occurrence; (2) property damage, $100,000; (3) personal injury protection (analogous to medical payments coverage) $100,000; (4) UM, $300,000 per person/$500,000 per occurrence; and (5) UIM, $300,000 per person/$500,000 per

4

occurrence. Notably, Oregon law mandates the UM coverage must include UIM protection. *See* Or. Rev. Stat. § 742.502(2)(a). In Oregon, State Farm combines the UM and UIM coverages and denotes both as a single "U" coverage. Olson and his staff admitted that before becoming involved in this litigation, they were unaware that "U" was used in Oregon to represent both UM and UIM coverage.

¶11 In May 2005, Stan called an employee of Olson, Jeannie Fetters (Fetters), on the telephone to discuss his State Farm policy. Fetters made note of the conversation in her records and recalled that Stan was interested in changing the deductibles on his collision coverage and removing his emergency road service coverage. During their conversation, Fetters reviewed his policy and mentioned to Stan that he did not have UIM coverage. Fetters admitted that the portion of the phone conversation dealing with UIM coverage lasted "maybe 30, 45 seconds, or a minute" and she did not discuss what UIM coverage entailed. Fetters testified that Stan told her that he was not interested and he only wanted to make the requested changes.

¶12 Following the automobile accident that occurred on October 19, 2006, the Baileys learned that they had only $5,000 in medical payments coverage and did not have any UIM coverage. In fact, the Baileys testified that they were unaware what UIM coverage was until after the accident. The drunk driver who caused the accident carried the statutory minimum automobile liability insurance limits. The Baileys' medical expenses and other damages far exceeded the liability coverage of the drunk driver.

¶13 On May 20, 2009, the Baileys filed their complaint against State Farm and Olson alleging that Olson was negligent in failing to obtain the appropriate insurance coverages.

5

The Baileys requested declaratory relief and asked the District Court to reform the insurance policy to include UIM coverage in the same amount as their liability coverage. The Baileys also alleged that Olson breached his fiduciary duty by failing to secure UIM coverage and failing to advise them of the need to obtain UIM coverage. Lastly, the Baileys alleged that Olson's actions constituted actual malice sufficient to support an award of punitive damages.

¶14 State Farm and Olson filed an answer to the complaint, in which they posited various defenses. However, they did not initially raise the affirmative defense of comparative fault. *See* M. R. C. P. 8(c). State Farm and Olson later sought to amend their answer to interpose the defense of "contributory negligence" on the part of the Baileys. However, in light of the court's subsequent entry of summary judgment for State Farm and Olson, it never addressed the merits of the motion to amend.

¶15 On January 13, 2012, State Farm and Olson filed a motion for summary judgment on all of the Baileys' claims. State Farm and Olson argued they were entitled to judgment as a matter of law because the Baileys declined UIM coverage in their insurance application and signed the application that listed the coverage limits. State Farm and Olson contended that Stan also declined UIM coverage when Fetters pointed out to him that he did not have UIM coverage during a phone conversation in May 2005. Furthermore, State Farm and Olson maintained that they only owed the Baileys a duty to obtain coverage that was requested, and they did not breach this duty. State Farm and Olson also argued that they did not owe the Baileys a fiduciary duty.

6

¶16 In response, the Baileys countered that summary judgment would be inappropriate because genuine issues of material fact remained regarding whether the Baileys were advised about UIM coverage. The Baileys argued that the extent of an insured's obligation to read an insurance policy depends on what is reasonable under the circumstances of each case and therefore cannot be decided as a matter of law. The Baileys asserted that their request for the same coverage as they had in Oregon qualifies as a request for specific insurance, so Olson's failure to obtain the requested insurance constitutes a breach of his duty. Though they acknowledge that this Court has not yet recognized a fiduciary relationship between an insurance agent and a client, the Baileys contend that the facts of their case support recognition of such a relationship.

¶17 On February 8, 2012, the District Court held oral argument on the motion for summary judgment. The District Court issued its order on March 19, 2012, granting summary judgment to State Farm and Olson. The District Court framed the issue in terms of whether the Baileys' statements, which were not contained within the application for insurance, could vary or alter the insurer's obligation to procure specific insurance. The District Court determined that the undisputed facts established that State Farm and Olson provided the specific insurance requested by the Baileys in the insurance application that Stan signed. The District Court reasoned that the Baileys' request for the same insurance as they had in Oregon cannot be construed as a specific request for UIM coverage or medical payments coverage in excess of $5,000 because the written application for insurance contained different terms. After determining that existing Montana law does not impose a heightened duty on an insurance agent, the District Court

7

concluded that no fiduciary relationship existed. The Baileys appeal from the District Court's entry of summary judgment in favor of State Farm and Olson.

## STANDARDS OF REVIEW

¶18 We review a district court's ruling on a motion for summary judgment de novo, applying the same criteria of M. R. Civ. P. 56 as the district court. *Steichen v. Talcott Props., LLC*, 2013 MT 2, ¶ 7, 368 Mont. 169, 292 P.3d 458; *Dubiel v. Mont. DOT*, 2012 MT 35, ¶ 10, 364 Mont. 175, 272 P.3d 66. Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." M. R. Civ. P. 56(c)(3).

## DISCUSSION

¶19 *Did the District Court err in granting summary judgment when it found no genuine issues of material fact with respect to the duty of State Farm and Olson to procure UIM coverage for the Baileys?*

¶20 Under Montana law, it is "well established that an insurance agent owes an absolute duty to obtain the insurance coverage which an insured directs the agent to procure." *Monroe v. Cogswell Agency*, 2010 MT 134, ¶ 32, 356 Mont. 417, 234 P.3d 79; *Fillinger v. Northwestern Agency*, 283 Mont. 71, 83, 938 P.2d 1347, 1355 (1997); *Lee v. Andrews*, 204 Mont. 527, 532, 667 P.2d 919, 921 (1983); *Gay v. Lavina State Bank*, 61 Mont. 449, 458, 202 P. 753, 755 (1921). If an insurance agent is instructed to procure specific insurance and fails to do so, he is liable for damages suffered due to the absence of such insurance. *Fillinger*, 283 Mont. at 83, 938 P.2d at 1355; *Lee*, 204 Mont. at 532, 667 P.2d at 921; *Gay*, 61 Mont. at 458, 202 P. at 755.

8

¶21 We have previously recognized that an insurance policy is a contract and is therefore subject to the applicable contract law of Montana. *Fillinger*, 283 Mont. at 77, 938 P.2d at 1351 (citing *Universal Underwriters Ins. Co. v. State Farm Mut. Auto. Ins. Co.*, 166 Mont. 128, 135, 531 P.2d 668, 673 (1975)). "Every insurance contract shall be construed according to the entirety of its terms and conditions as set forth in the policy and as amplified, extended, or modified by any rider, endorsement, or application which is a part of the policy." Section 33-15-316, MCA.

¶22 While it is generally presumed that a person who executes a written contract knows its contents and assents to them, an insured does not have an absolute duty to read an insurance policy. *Robertus v. Farmers Union Mut. Ins. Co.*, 2008 MT 207, ¶ 42, 344 Mont. 157, 189 P.3d 582; *Thomas v. Northwestern Nat'l Ins. Co.*, 1998 MT 343, ¶ 28, 292 Mont. 357, 973 P.2d 804 (citing *Fillinger*, 283 Mont. at 78, 938 P.2d at 1352). Instead, "the extent of an insured's obligation to read the policy depends upon what is reasonable under the facts and circumstances of each case." *Robertus*, ¶ 42 (quoting *Thomas*, ¶ 27). The relationship between the insured and the insurance agent is an important factor to consider when examining the insured's duty to read the insurance contract. *Fillinger*, 283 Mont. at 77-78, 938 P.2d at 1352-53. Once an insured informs an insurance agent of his insurance needs and the agent's conduct permits a reasonable inference that the agent is highly skilled in this area, an insured is justified in relying on an insurance agent to obtain the coverage that the agent has represented he will obtain. *Fillinger*, 283 Mont. at 78, 938 P.2d at 1352 (citing *Fiorentino v. Travelers Ins. Co.*, 448 F. Supp. 1364, 1369 (E.D. Pa. 1978)). The insured's failure to read an insurance policy

9

does not operate as a bar to relief as a matter of law, but it may constitute comparative negligence. *See Fillinger*, 283 Mont. at 78, 938 P.2d at 1352 (citations omitted).

¶23 The District Court determined that State Farm and Olson met their initial burden of establishing that they provided the specific insurance requested by the Baileys in their application for insurance. The District Court relied on the fact that the insurance coverage requested in the insurance application was actually provided to the Baileys. Since Stan signed the application for insurance, the District Court reasoned that the Baileys' request for the same insurance they had in Oregon could not be construed as a specific request for UIM coverage and medical payments coverage in excess of $5,000. The District Court applied the parol evidence rule and concluded that it was arguable whether the Baileys' oral request for the same insurance they carried in Oregon would be admissible to alter the terms of a clear and unambiguous application and policy. The District Court also emphasized Softich's uncontroverted testimony that it was her normal practice to explain the coverages to clients, and Fetter's testimony that she later informed Stan that he lacked UIM coverage before the accident occurred. Ultimately, the District Court concluded that negligence could be decided as a matter of law and entered judgment in favor of State Farm and Olson.

¶24 In *Featherston by & ex rel. Featherston v. Allstate Ins. Co.*, 875 P.2d 937 (Idaho 1994), the Idaho Supreme Court addressed the duty owed by an insurer to an insured when the insured transfers a policy and requests that the insurer procure the same coverage. The insured in *Featherston* contacted an Allstate agent, provided the agent with the declarations page of his Farmers Insurance policy, and requested a price quote

10

for the same coverage with Allstate. *Featherston*, 875 P.2d at 938. After receiving a price quote, the insured transferred his insurance policy to Allstate. *Featherston*, 875 P.2d at 938. The insured admitted that he never read the Allstate policy. *Featherston*, 875 P.2d at 938. More than five years after transferring to Allstate, a member of the insured's family was injured in an accident with an underinsured driver and the insured learned that he had no UIM coverage. *Featherston*, 875 P.2d at 938-39. The Court determined that "[t]he scope of Allstate's duty depends on what the agent was asked to provide." *Featherston*, 875 P.2d at 940. It reversed the trial court's entry of summary judgment in favor of the insurer, concluding that a genuine issue of material fact existed as to what coverage was requested and the consequent duty that arose as a result of that request. *Featherston*, 875 P.2d at 940-41.

¶25    Our review of the record here similarly demonstrates that genuine issues of material fact exist as to whether State Farm and Olson acted negligently in transferring the Baileys' Oregon policy to Montana. It is undisputed that the Baileys directed Olson's agent, Softich, to procure the same insurance coverage as they had in Oregon. It is also undisputed that the Baileys' Montana State Farm policy that they obtained through Olson did not contain the same coverages and limits as their Oregon policy. The Montana policy contained very high liability and UM limits, but very low medical payment coverage and no UIM protection. Notably, none of the agents at Olson knew that Oregon combined UM and UIM coverage and designated such coverages using different letters. The Baileys posit that these differences between coverages caused Softich to mistakenly

11

omit UIM coverage, when, given her expertise, she should have known the states handled such coverages differently.

¶26 Softich had no specific recollection of what she discussed with the Baileys, but testified that it was her usual practice to go through and explain each coverage with a new client. However, Softich also testified that she would not advise clients to decrease their coverage limits. Absent some specific recollection about what was discussed and why the Baileys did not receive the same coverages and limits as they had in Oregon, a genuine issue of material fact exists as to why the discrepancies in coverage occurred when the Baileys transferred their State Farm policy to Montana.

¶27 We next turn to the District Court's conclusion that evidence of the Baileys' oral statements during the meeting with Softich are arguably barred by the parol evidence rule. Contrary to the District Court's assertion, the Baileys' oral request for matching coverage in Montana is not barred by the parol evidence rule. Extrinsic evidence may be considered "when a mistake or imperfection of the writing is put in issue by the pleadings" or "when the validity of the agreement is the fact in dispute." Section 28-2-905(1)(a)-(b), MCA. The Baileys have put the validity of the insurance application at issue by representing that they did not fill it out or understand all of its terms, and the application did not contain the terms that they requested. Since an insurance agent has a duty to obtain the coverage requested by a client, the Baileys' claims that they orally requested "full coverage" and the same exact coverage as they had in Oregon must necessarily be considered when examining whether their insurance agent breached her duty. Based on the evidence in the record, a jury could reasonably conclude that Softich

12

transcribed different terms into the application than what the Baileys requested. The Baileys have produced sufficient evidence to survive summary judgment.

¶28 Furthermore, the District Court misapprehended the effect of Stan's signing of the application for insurance. The insurance application was an electronic form that Softich completed. Softich was the person who selected the coverages and limits when filling out the form. After Softich completed the form, she printed it and Stan signed it. Given the Baileys' uncontroverted testimony that they requested the same coverage as they had in Oregon and requested "full coverage," a fact question may exist as to whether the Baileys acted reasonably in relying upon the representations of Softich rather than reading the application for insurance and the policy.[1] As noted above, however, the District Court never reached the question of whether State Farm and Olson may amend their answer to allege that the Baileys' conduct should be compared to that of State Farm and Olson. This will be a determination for the District Court to make on remand.

¶29 The remaining issue is the phone conversation that occurred in May 2005. Fetters testified that it was a short conversation, but her notes indicate that she mentioned to Stan that he did not have UIM coverage. Stan testified that he was under the impression that he had the same coverage as he had in Oregon, and therefore did not need any additional coverage. Fetters admitted that she did not explain what UIM coverage was during this

---

[1] The dissent incorrectly asserts that the Court is adopting a "new, broadly-stated, 'no-read' principle." This assertion is completely unfounded. As our case law clearly establishes and as addressed in ¶ 22, the extent of an insured's obligation to read the policy is dictated by what is reasonable under the particular facts and circumstances of each case. A determination of what is reasonable is, of course, a fact issue for resolution by a jury. Thus, we do not adopt a new principle; we merely follow the law.

13

phone conversation with Stan, and the Baileys maintained that they did not even know what UIM coverage was until after the accident. The parties' varying accounts of the conversation further demonstrate the need to submit these factual issues to the jury.

¶30 Under the facts and circumstances of this case, State Farm and Olson have not met their "heavy burden of demonstrating, in a manner sufficient to exclude any real doubt," that the Baileys did not request different insurance than what they received. *Monroe*, ¶ 32. Negligence actions typically involve questions of fact and ordinarily are not susceptible to summary judgment. Questions of fact can be determined as a matter of law only when reasonable minds cannot differ. *Meloy v. Speedy Auto Glass, Inc.*, 2008 MT 122, ¶ 10, 342 Mont. 530, 182 P.3d 741; *Henricksen v. State*, 2004 MT 20, ¶ 19, 319 Mont. 307, 84 P.3d 38. In deciding a motion for summary judgment, all reasonable inferences must be drawn in favor of the non-moving party so that if there is any doubt as to the existence of a genuine issue of material fact, that doubt must be resolved in favor of the party opposing summary judgment. *Lorang v. Fortis Ins. Co.*, 2008 MT 252, ¶ 38, 345 Mont. 12, 192 P.3d 186; *Newbury v. State Farm Fire & Cas. Ins. Co.*, 2008 MT 156, ¶ 14, 343 Mont. 279, 184 P.3d 1021. Drawing all reasonable inferences in favor of the Baileys, we conclude that reasonable minds could differ concerning whether State Farm and Olson acted negligently when placing the Baileys' coverage. Therefore, the District Court erred in entering summary judgment in favor of State Farm and Olson on Baileys' negligence claims.

¶31 *Did the District Court err in granting summary judgment by failing to recognize and impose a duty arising in negligence beyond a duty to procure requested coverage?*

14

¶32    Because we reverse the entry of summary judgment and remand for trial on the merits under the negligence theory asserted by the Baileys, we deem it unnecessary to the resolution of this case to determine whether these circumstances may also give rise to a heightened duty on the part of Olson. We therefore decline to address the Baileys' second issue.

## CONCLUSION

¶33    For the foregoing reasons, we reverse the District Court's grant of summary judgment and remand for further proceedings in accordance with this Opinion.


                                              /S/ PATRICIA COTTER


We Concur:

/S/ MIKE McGRATH
/S/ MICHAEL E WHEAT
/S/ BRIAN MORRIS



Justice Jim Rice, dissenting.

¶34    In my view, the record establishes that the District Court correctly granted summary judgment to the Defendants.

¶35    "The party moving for summary judgment has the initial burden of proving that no genuine issues of material fact exist. . . . The burden then shifts to the non-moving party to prove by more than mere denial and speculation that a genuine issue of material fact

15

exists." *Brown & Brown of MT, Inc. v. Raty*, 2012 MT 264, ¶ 17, 367 Mont. 67, 289 P.3d 156 (citing *Myers v. Dee*, 2011 MT 244, ¶ 10, 362 Mont. 178, 261 P.3d 1054). State Farm presented sufficient evidence to carry its initial burden, demonstrating from the record that it had obtained the insurance coverage the Baileys had requested. The Court's analysis impliedly reaches that conclusion also. Opinion, ¶¶ 23, 25, 30. However, although Baileys demonstrated a genuine issue of material fact with regard to *some* of State Farm's evidence, they failed to satisfy their burden to demonstrate a genuine issue as to the entirety of State Farm's evidence, and thus failed to carry their burden.

¶36 State Farm presented the testimony of Nola Softich, who testified that it was her custom and practice to provide a new customer with the "goldenrod pamphlet," which was "included with every packet" given to customers. This pamphlet described all the coverages available for purchase from State Farm. Softich always reviewed those coverages with the customer, including uninsured and underinsured motorist coverages. This is evidence of the standard procedure Softich would have followed when meeting with the Baileys on April 3, 1998. As the District Court noted, the Baileys offered no evidence to specifically refute Softich's testimony that these coverages had been discussed. However, the Baileys did testify that they gave their insurance card to the agency and requested the same coverages as they had in Oregon. Softich testified that she has never advised an insured to decrease uninsured or underinsured coverage. This evidence about the parties' initial conversation reflects a genuine issue of fact about what understanding arose from that conversation. If there was no further evidence, denial of summary judgment would be appropriate.

¶37 Based on that initial conversation, Softich then prepared two applications for coverage on Baileys' two vehicles. The applications were one-page printed forms that listed 12 coverages in column form. The heading of this column was "Coverages Available." Next to the column of available coverages was another column with the heading "Selected?" Under this heading, a "Yes" or "No" was entered next to each coverage indicating whether or not the applicant had selected that coverage. On both applications, the word "No" appeared next to the coverage for underinsured motor vehicle. However, the coverages were not identical on each application. A different list of coverages was selected for each vehicle, although UIM coverage was selected for neither vehicle. At the bottom of each application, as the Court notes in ¶ 7 of the Opinion, the form stated that the applicant was applying "for the insurance indicated," that the applicant had read the form and the statements were correct, and that the applicant had personally selected the coverages. Stan Bailey signed both applications. These documents are the result of the parties' initial conversation on April 3, 1998.

¶38 The Court cites the principle that an insured does not have an absolute duty to read an insurance policy. Opinion, ¶ 22. On the basis of this principle, the Court apparently excuses any obligation on the part of the Baileys to read or be accountable for the signed applications and statements made therein. However, we have applied the "no read" principle only in cases where an insurer made changes within the body of a *policy* and the insured was not otherwise notified of the change. *Robertus*, ¶ 42; *Thomas*, ¶¶ 26-27; *Fillinger*, 283 Mont. at 78-79, 938 P.2d at 1352. Never before have we held that an insurance applicant has no obligation to read a one-page application form that plainly

17

lists coverage choices and on which the applicant certifies that he has read the form and made the coverage choices as indicated. The Court cites no authority for this principle. The Court also holds that Baileys' statement about wanting the same coverage as they had in Oregon is not barred by the parol evidence rule because, by merely alleging they did not understand its terms, the Baileys have made a proper challenge to "the validity of the insurance application" prepared by Softich. Opinion, ¶ 27. Such a weak factual assertion should not be permitted to create a genuine issue of fact about the signed applications. "To raise a genuine issue of material fact, the proffered evidence must be 'material and of a substantial nature, not fanciful, frivolous, gauzy or merely suspicious.'" *Estate of Willson v. Addison*, 2011 MT 179, ¶ 14, 361 Mont. 269, 258 P.3d 410. "Generally speaking, once an agreement is reduced to writing, it is considered to contain all terms of the agreement and extrinsic evidence concerning the intentions of the parties is not admissible. Section 28-2-905(1), MCA." *McCulley v. Am. Land Title Co.*, 2013 MT 89, ¶ 33, ___ Mont. ___, ___ P.3d ___. On this record, I would conclude that the Baileys did not present sufficient evidence to create a genuine factual issue about the signed applications, which were individually prepared for each of the Baileys' two vehicles after the parties' initial conversation, and signed by the Baileys underneath language stating that they had read the form and chosen the coverages as indicated.

¶39 Thereafter, the Baileys paid premiums for the next seven years and received insurance coverage cards, policies and booklets. The Baileys received new insurance cards at least two times a year for each policy, listing their coverages. They also received renewal notices two times a year for each policy, with each notice listing the coverages

and charges for each coverage. The Baileys simply allege that they didn't read any of these and the Court, apparently under the new, broadly-stated, "no-read" principle, accepts this excuse and gives no significance to this evidence. However, this is further evidence that State Farm provided the coverages that the Baileys had requested.

¶40 Then, in 2005, Stan called the agency and talked to Jeannie Fetters to make some changes in his coverages. In that conversation, Fetters pointed out to Stan that he did not have UIM coverage, and Stan responded he did not want to add that coverage, but, rather, only wanted to make the changes he had called about. Fetters specifically remembered the conversation and also made notes about the conversation in State Farm's master record. Baileys offered no contradictory evidence. However, the Court, citing the Baileys' assertion that "they did not even know what UIM coverage was until after the accident," concludes that there are "varying accounts" about this conversation. Opinion, ¶ 29. This is incorrect. Baileys offered nothing in contradiction to the very specific and recorded evidence offered by State Farm about this conversation. Baileys' statement merely claims ignorance about the nature of UIM insurance—again, "gauzy" and speculative evidence—and nothing about the conversation.

¶41 To further rebut the evidence of this 2005 event, the Court again cites Stan's abiding belief that he had the same coverage as he had in Oregon. The Court's reliance on Stan's Oregon coverage pales when it is recalled that the Baileys made that request seven years earlier in 1998, thereafter signed contrary application forms, paid contrary premiums, and received contrary coverage notices until 2005, when Stan called to *change* their coverages. By then, the "Oregon request" was long past and there is no evidence

19

that Stan was still trying to obtain the same coverage he had in Oregon. As we have recently stated, when reviewing the record for purposes of summary judgment, it is important to recognize the "chronology of events" that the evidence demonstrates. *McCulley*, ¶ 35.

¶42 I would conclude that the Baileys did not carry their burden to demonstrate genuine issues of material fact and that State Farm was entitled to summary judgment as a matter of law. I would affirm the District Court.


/S/ JIM RICE


Justice Beth Baker, dissenting.

¶43 I agree with Justice Rice that the District Court did not err in granting summary judgment to State Farm on this record. I write separately because of my concern that the Court has in fact imposed a heightened duty on an insurance agent, despite its statement to the contrary. Opinion, ¶ 32.

¶44 Baileys raised, as their second issue on appeal, the claim that State Farm and Olson had "a duty to advise the Baileys regarding UIM coverage," and they urge this Court to "expand an agent's duty beyond a mere duty to procure" the insurance requested by the insured. They cite numerous cases from other jurisdictions in which courts have held that an insurance agent's duty is not limited to responding to a specific request for coverage, but that an agent may be liable under theories of professional negligence for

20

failing to recommend UIM coverage or advise the insured of coverage needs. They also point out "that no such heightened duty of care has yet been recognized under Montana law." *Monroe v. Cogswell Agency*, 2010 MT 134, ¶ 31, 356 Mont. 417, 234 P.3d 79. By finding a factual issue for trial on the basis that Fetters did not explain UIM coverage when Stan called her in May 2005 to change his coverages (Opinion, ¶ 29), the Court is at least implicitly ruling that Olson and his agents had a heightened duty to advise or offer specific coverages, just as Baileys have requested. Without expressly so holding, the Court's ruling today will generate additional confusion in the law regarding the scope of an insurance agent's duty to the insured.

/S/ BETH BAKER