FILED

June 16 2015

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 14-0397

DA 14-0397

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2015 MT 161

LESLEE WEBER,

　　　　Plaintiff, Appellant, and Cross-Appellee,

　　v.

STATE OF MONTANA,

　　　　Defendant, Appellee, and Cross-Appellant.

APPEAL FROM:　District Court of the First Judicial District,
In and For the County of Broadwater, Cause No. DV 2011-58
Honorable James P. Reynolds, Presiding Judge

COUNSEL OF RECORD:

　　　　For Appellant:

　　　　　　Norman L. Newhall, Linnell, Newhall, Martin & Schulke, P.C.,
Great Falls, MT

　　　　For Appellee:

　　　　　　Randy J. Cox, Boone, Karlberg, P.C., Missoula, Montana

　　　　　　Pamela Snyder-Varns, Risk Management & Tort Defense Division,
Helena, Montana

　　　　　　　　Submitted on Briefs:　April 15, 2015
　　　　　　　　　　　　Decided:　June 16, 2015

Filed:

_____
　　　　　　　　　　Clerk

Justice Beth Baker delivered the Opinion of the Court.

¶1 Leslee Weber appeals the First Judicial District Court's March 3, 2014 order granting summary judgment to the State of Montana. The State cross-appeals the District Court's August 14, 2013 order denying summary judgment to the State. Because we resolve the case on the State's cross-appeal, we do not reach the issues Weber raises on appeal. The question presented in the cross-appeal is whether, in its 2013 order, the District Court erred in rejecting the State's request for immunity under § 41-3-203(1), MCA. We reverse the District Court's 2013 denial of summary judgment and affirm the court's judgment in favor of the State.

## PROCEDURAL AND FACTUAL BACKGROUND

¶2 This case arises from marriage dissolution proceedings between Leslee Weber and Kelly Etapa, the birth parents of two minor daughters, F.E. and G.E. In May 2007, Weber and Etapa were legally separated by a Wisconsin court. In June of that year, Weber and the girls left Wisconsin to spend the summer at the family's cabin in Montana. Etapa trailered the family's horses to Montana and returned to Wisconsin the following day.

¶3 Before leaving, Weber applied for a job in Wisconsin and was scheduled to return there in August. While she was in Montana, Weber discovered that she was not chosen for the Wisconsin job, and she decided to seek employment in Montana. In July, Weber was hired as a counselor at the Willow Creek School in Broadwater County. She notified Etapa via certified letter that she intended to remain in Montana with F.E. and G.E.

2

¶4 In September 2007, Weber contacted the Broadwater County Sheriff's Department and said that Etapa had made threats against F.E. and G.E. The Sheriff's Department referred Weber to Brooke Dolan, the Broadwater County Crime Victims Advocate. In October, Etapa filed a motion in the Wisconsin court to enforce that court's physical placement order governing custody and visitation. The Wisconsin court issued an order requiring Weber to allow Etapa to have visitation with F.E. and G.E. over Christmas. On November 30, Weber called the Centralized Intake, Child and Family Services Division of the State of Montana Department of Public Health and Human Services (Department) and said she feared that, once her divorce was final, Etapa would emotionally and verbally abuse F.E. and G.E. The Centralized Intake specialist instructed Weber to discuss her concerns with her attorney and, as her divorce was not yet final, to address through her parenting plan any fears that Etapa would abuse F.E. and G.E.

¶5 In December 2007, Weber filed for divorce in Broadwater County and obtained a Temporary Order of Protection, barring Etapa from contact or communication with Weber, F.E., or G.E. Around the same time, Weber asked Lisa Schmiesing, a licensed social worker, to evaluate F.E. and G.E. to determine how their upcoming visit with Etapa would affect them. Schmiesing met with F.E. and G.E. four times between December 2007 and January 2008. On January 24, Schmiesing called Centralized Intake at the Department and reported that she believed Weber was psychologically abusing the girls and might physically harm them. Schmiesing also filed a written Child Protection Report, documenting the same concerns:

> I have come to the conclusion that [the girls'] father has NOT abused them and their mother has brainwashed them into believing their father is evil and should be killed. . . . I am very concerned for the girls' safety. I believe that their mother is seriously delusional (mentally ill) and if she has any suspicions that I believe the girls should see their dad she will take them and run away so that their father cannot find them. . . . I believe the girls should be removed from their mother's custody immediately to prevent further psychological damage. I believe their mother would physically harm (perhaps even kill them) if she believes they will be seeing their dad.

Schmiesing further reported that she contacted Dolan, who shared her concerns.

¶6     The Department assigned Child Protection Specialist Kathryn Lamach to investigate Schmiesing's report. On January 24, 2008, the day the Department received Schmiesing's report, Lamach interviewed Schmiesing and Dolan. Because the allegations in Schmiesing's report were so serious, Lamach immediately "staffed" the report by calling a meeting with her supervisor, Don Ferriter, Regional Child Protection Services Administrator Kathy Ostrander, Broadwater County Attorney John Flynn, Dolan, and Schmiesing.

¶7     At the meeting, Schmiesing provided the Department with her case notes and discussed her therapy sessions with F.E. and G.E. During the therapy sessions, Schmiesing had observed that F.E. and G.E. showed troubling behavior, such as referring to their father as "Kelly," discussing ways of killing him, and dancing around saying they wanted him dead. Schmiesing noted that F.E. and G.E. would relate incidents of alleged abuse by Etapa but were unable to provide details, and that Weber frequently called to tell Schmiesing what to write in her notes. Schmiesing believed Weber was brainwashing the girls into hating their father and wanting to kill him. Schmiesing

4

advised the Department that Weber told her she might "go underground" with the girls to keep them from Etapa. Schmiesing was concerned that Weber might kill the girls to keep them from their father. Dolan corroborated Schmiesing's observations and advised that she had witnessed a dramatic change in the way the children viewed their father since the previous summer, when Weber first brought F.E. and G.E. to see Dolan. Initially, the girls spoke fondly of their father and missed him but, more recently, the girls told Dolan that Etapa hurt them and that they wanted to kill him. Both Dolan and Schmiesing witnessed Weber talking about the divorce proceedings and making disparaging remarks about Etapa in front of F.E. and G.E.

¶8 County Attorney Flynn filed petitions for Emergency Protective Services, Temporary Investigative Authority, and Temporary Legal Custody for F.E. and G.E. on January 25, 2008. Flynn attached to each petition a copy of an affidavit signed by Lamach in support of the petitions. On January 28, the District Court granted the State's petitions. On January 29, the Department removed F.E. and G.E. from Weber's custody, placed them into foster care, and notified Weber of the removal. On February 27, 2008, the District Court issued an order dismissing the Youth in Need of Care case, stating, "The Court is unable to find that [Weber] is endangering her children, or that they are being abused or neglected for the purposes of this proceeding." The Department returned F.E. and G.E. to Weber's care.

¶9     In 2011, Weber sued Schmiesing, the State of Montana, and Broadwater County.[1] Weber's complaint against the State alleged that the Department negligently failed to adequately investigate Schmiesing's report before removing F.E. and G.E. from Weber's care. Weber alleged that, as a result of the State proceedings, she was wrongfully charged with and arrested for criminal contempt in Wisconsin, she was denied custody of and visitation with her children, and she suffered from invasion of privacy, embarrassment and shame, financial loss, and severe and prolonged emotional distress with physical manifestations.

¶10    In October 2012, the State moved for summary judgment, arguing that it was immune from suit under § 41-3-203(1), MCA. On August 14, 2013, the District Court denied the motion. The court based its decision on Weber's allegation that Lamach's affidavit misled the prosecutor and judge because, though Lamach swore to her qualifications and training to investigate child abuse and neglect, she offered no evidence that she "conducted some of the steps from her training" in investigating Schmiesing's allegations. The court concluded, "Whether the State actually qualifies for [statutory] immunity in this case presents a genuine issue of material fact, dependent on the degree to which Lamach conducted her investigation in keeping with her training."

¶11    The proceedings continued, and the State again moved for summary judgment, this time on the ground that Weber had not provided expert testimony necessary to establish that Lamach was subject to and violated a standard of care. On March 3, 2014,

---

[1] The District Court granted summary judgment to Broadwater County in July 2012. Weber does not appeal this order. Weber later stipulated to dismissal with prejudice of her claims against Schmiesing.

the District Court granted that motion. The court entered judgment in favor of the State on March 21, 2014.

## STANDARDS OF REVIEW

¶12 We review summary judgment orders de novo. *Bailey v. State Farm Mut. Auto. Ins. Co.*, 2013 MT 119, ¶ 18, 370 Mont. 73, 300 P.3d 1149. Summary judgment is appropriate when the moving party demonstrates an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. M. R. Civ. P. 56(c)(3); *Smith v. Burlington N. & Santa Fe Ry. Co.*, 2008 MT 225, ¶ 10, 344 Mont. 278, 187 P.3d 639. The burden then shifts to the party opposing summary judgment to "present substantial evidence essential to one or more elements of its case to raise a genuine issue of material fact," or to show why the undisputed facts do not entitle the moving party to judgment. *Dollar Plus Stores, Inc. v. R-Mont. Assocs., L.P.*, 2009 MT 164, ¶ 27, 350 Mont. 476, 209 P.3d 216 (citing *Fielder v. Bd. of Cnty. Comm'rs*, 2007 MT 118, ¶ 12, 337 Mont. 256, 162 P.3d 67). The interpretation of a statute is a question of law that we review for correctness. *City of Missoula v. Iosefo*, 2014 MT 209, ¶ 8, 376 Mont. 161, 330 P.3d 1180.

## DISCUSSION

¶13 Section 41-3-203(1), MCA (2007),[2] provides in pertinent part:

> Anyone investigating or reporting any incident of child abuse or neglect . . . [or] participating in resulting judicial proceedings . . . is immune from any liability, civil or criminal, that might otherwise be incurred or imposed unless the person was grossly negligent or acted in bad faith or with

---

[2] Unless otherwise indicated, all statutory references are to the 2007 version of the Montana Code Annotated.

malicious purpose or provided information knowing the information to be false.

In its 2013 order denying summary judgment, the District Court noted this Court's ruling that "where Montana law protects private citizens from liability, it also protects the State." *Gudmundsen v. State ex rel. Mont. State Hosp. Warm Springs*, 2009 MT 56, ¶ 24, 349 Mont. 297, 203 P.3d 813 (analyzing whether the State was immune from liability under § 27-1-1103, MCA, which governs liability of mental health professionals). Applying *Gudmundsen*, the District Court held that immunity under § 41-3-203(1), MCA, extends to the State "to the same extent" that it extends to Lamach. Weber does not appeal that ruling. Weber also has not argued that the State acted in bad faith or with malicious purpose. She contends, rather, that summary judgment properly was denied because there are genuine issues of material fact as to whether the State was grossly negligent or knowingly provided false information.

*Gross negligence*

¶14    This Court has defined gross negligence as the "failure to use slight care." *Rusk v. Skillman*, 162 Mont. 436, 441, 514 P.2d 587, 589 (1973) (quoting *Batchoff v. Craney*, 119 Mont. 157, 166, 172 P.2d 308, 313 (1946)) (emphasis removed). *See also Black's Law Dictionary* (Bryan A. Garner ed., 10th ed. 2014) (defining "gross negligence" as "[a] lack of even slight diligence or care.").

¶15    Weber argues that Lamach failed to use slight care because she filed affidavits in support of dependency proceedings just one day after Schmiesing's report and relied on reports by only two witnesses—Schmiesing and Dolan—when Lamach had no

knowledge of either witness's background, training, or qualifications, and obtained no corroborating information from persons familiar with Weber's parenting of the children. Weber argues that the State easily could have done more to investigate Schmiesing's report by contacting Weber; meeting with F.E. and G.E.; interviewing Weber's employer, co-workers, or neighbors; investigating the circumstances surrounding the December 2007 protective order Weber obtained against Etapa; or inquiring into the Wisconsin custody proceedings. According to Weber, under § 41-3-301(7), MCA, the State was *required* to interview her before removing F.E. and G.E. Weber also argues that Ostrander, Ferriter, and County Attorney Flynn failed to exercise slight care when they relied on Schmiesing's report and Lamach's affidavit without conducting an independent investigation.

¶16 The State counters that the list of tasks Weber argues Lamach should have completed before filing her affidavit is unsupported by authority or expert testimony. Additionally, the State argues that § 41-3-301(7), MCA, did not require the State to interview Weber or to contact her friends, co-workers, or children. Weber does not dispute that, before filing her affidavits, Lamach interviewed Schmiesing and Dolan, reviewed Schmiesing's therapy notes, and discussed Schmiesing's report with her supervisor, co-workers, the Regional Administrator, and the prosecutor. All six professionals who discussed Schmiesing's report agreed that immediate removal of F.E. and G.E. from Weber's care was necessary to ensure the girls' safety.

9

¶17 Before reaching a decision, the Department discussed Schmiesing's report with Dolan, who corroborated many of Schmiesing's concerns. Ferriter testified that he knew Dolan, that Dolan was "professional and hardworking," and that Dolan had been involved in many of the Department's cases. Ferriter further testified that he believed Lamach conducted a thorough investigation because she "[r]eviewed the information from the Centralized Intake," "staffed" Schmiesing's report by meeting with her co-workers, supervisors, and the prosecutor, and "got some direction from that staffing." After the meeting, County Attorney Flynn initiated dependency proceedings and obtained court orders.

¶18 Under § 41-3-301(7), MCA,

> If the department determines that a petition for immediate protection and emergency protective services must be filed to protect the safety of the child, the social worker shall interview the parents of the child to whom the petition pertains, if the parents are reasonably available, before the petition may be filed.

The Department determined that Weber was not "reasonably available" because she threatened to flee with her children and, therefore, the Department was wary of alerting her to any investigation.

¶19 The State's summary judgment evidence established that, having received a serious and urgent report from a licensed social worker of potential harm to two minor children, Lamach acted immediately to interview the social worker, obtained corroborating information from the County's victim-witness advocate, and gathered her superiors together to determine the best way to proceed. With a credible threat that

10

Weber may flee with the children, the Department decided not to contact individuals close to Weber who may have alerted her that she was being investigated.

¶20    In response to this summary judgment evidence, Weber argued that, had Lamach simply interviewed Weber, her co-workers, or any number of other individuals, it would have become apparent that Schmiesing's fears were unfounded.  But Weber's burden at that point was "to show, by more than mere denial, speculation, or conclusory statements, that a genuine issue of material fact exists." *LaTray v. City of Havre*, 2000 MT 119, ¶ 14, 299 Mont. 449, 999 P.2d 1010.  Weber offered no evidence to establish that, in the face of a report that Weber may flee with her children and cause them harm, Lamach's failure to interview Weber or others who may alert her amounted to the absence of even slight care or diligence in the conduct of her investigation.  Section 41-3-301(1), MCA, permits a child protective social worker to remove a child immediately if there is reason to believe that the child "is in immediate or apparent danger of harm[.]"  Weber did not demonstrate a triable question of fact that the Department's decision to ensure the safety of F.E. and G.E. by choosing not to alert Weber of Lamach's investigation was grossly negligent.

*False information*

¶21    Weber argues that Lamach knowingly provided false information in several statements in her affidavit.  First, Weber argues that Lamach, in signing her affidavit, vouched for the truth of the information in it.  Weber also argues that Lamach knowingly provided false information by stating that she conducted a "thorough investigation" into

Schmiesing's report. According to Weber, Lamach should have completed several tasks for her investigation to be considered "thorough."

¶22 Lamach's statement that her investigation was "thorough" is an opinion, not information. In any event, Weber does not dispute that Lamach interviewed Schmiesing and Dolan and discussed Schmiesing's report with co-workers, supervisors, and County Attorney Flynn. Weber acknowledges that "the numerous avenues of inquiry" she alleges Lamach failed to pursue were "suggested" in relevant statutes and the Department's Policy Manual, implicitly conceding that the Department retains discretion under the law in the conduct of its investigation. *See* § 41-3-202(1), MCA (requiring the Department to "promptly assess" a report of child abuse or neglect, and directing a "thorough investigation" of all "nonfinancial matters that *in the discretion of the investigator* are relevant to the investigation" (emphasis added)). Weber did not provide evidence to rebut testimony by the State's witnesses that Lamach conducted a thorough investigation. In her affidavit, Lamach merely vouched for the correctnesss of her transmittal to the court of information from two witnesses: Schmiesing and Dolan. As the State notes, both Schmiesing and Dolan testified that Lamach's affidavit accurately conveyed the information they provided to the Department.

¶23 Weber also contends that Lamach knowingly provided false information because her affidavit falsely states that "per Department policy Section 302-1 [of the Department's Policy Manual], Social Worker did inform parents that they may have a support person present during any in-person meeting with the Social Worker concerning emergency protective services." The State does not dispute that Lamach's affidavit

12

contains this statement. Nor does the State dispute that Weber was never informed of the emergency protective services before the Department removed F.E. and G.E. from her care. However, the State points out that Lamach's statement is "boilerplate language" drawn from § 41-3-427(1)(d), MCA, which states that a petition for immediate protection and emergency protective services "must include a notice advising the parents . . . that the parents . . . may have a support person present during any in-person meeting with a social worker concerning emergency protective services." The statute does not require that the parents be informed of this right *before* the State files the petition. According to the State, Lamach merely forgot to strike the standard clause from her affidavit. But Lamach did make clear in her affidavit that immediate removal of F.E. and G.E. from Weber's care was necessary due to the Department's concerns about their safety and the risk that Weber would abscond with them.

¶24 Finally, Weber argues that Lamach's affidavit falsely stated that "the Department does not have any previous reports on this family." Weber contends that this statement is false in light of her December 2007 phone call to the Department's Centralized Intake when Weber reported her concern that, once her divorce was final, Etapa would subject F.E. and G.E. to emotional and verbal abuse. As the State points out, the operator designated Weber's call to the Department as "informational," meaning it did not merit investigation. The incident report reflects that, though Weber was concerned about a future threat to her children, she "had no current information or situations of abuse to disclose." The Centralized Intake Specialist instructed Weber to discuss her concerns with her attorney and to address her fear of potential abuse in her parenting plan. In her

13

deposition, Lamach testified that her statement that there were no prior reports "means that there were no reports involving investigations for the family." Weber does not dispute that her call to Centralized Intake did not result in an investigation.

¶25 Weber's arguments demonstrate one incorrect statement of fact in Lamach's affidavit. But, standing alone, the existence of that incorrect statement does not establish a genuine issue for trial as to whether Lamach knowingly provided false information in an attempt to remove Weber's children from her.

## CONCLUSION

¶26 Upon de novo review of the summary judgment record, we conclude that Weber failed to establish a genuine issue of material fact to support her claim that the State employees involved in the investigation were grossly negligent or knowingly provided false information. The State is entitled as a matter of law to immunity from Weber's claims under § 41-3-203(1), MCA. Because that issue resolves the case, we do not consider whether the District Court erred by concluding that Weber was required to present expert testimony to establish the State's standard of care for investigating a report of child abuse. We reverse the District Court's August 14, 2013 decision and order, and affirm its March 21, 2014 judgment in favor of the State.

/S/ BETH BAKER

We concur:

/S/ MIKE McGRATH
/S/ PATRICIA COTTER
/S/ LAURIE McKINNON
/S/ MICHAEL E WHEAT

14