FILED

03/28/2023

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 22-0254

DA 22-0254

IN THE SUPREME COURT OF THE STATE OF MONTANA

2023 MT 54N

STATE OF MONTANA,

Plaintiff and Appellee,

v.

DAVID VINCENT STRACHAN,

Defendant and Appellant.

APPEAL FROM:   District Court of the First Judicial District,
In and For the County of Lewis and Clark, Cause No. CDC-2021-127
Honorable Kathy Seeley, Presiding Judge

COUNSEL OF RECORD:

For Appellant:

Palmer A. Hoovestal, Hoovestal Law Firm, PLLC, Helena, Montana

For Appellee:

Austin Knudsen, Montana Attorney General, Roy Brown, Assistant
Attorney General, Helena, Montana

Kevin Downs, Lewis and Clark County Attorney, Helena, Montana

Submitted on Briefs:  March 8, 2023

Decided:  March 28, 2023

Filed:

_____
Clerk

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1 Pursuant to Section I, Paragraph 3(c), Montana Supreme Court Internal Operating Rules, this case is decided by memorandum opinion and shall not be cited and does not serve as precedent. Its case title, cause number, and disposition shall be included in this Court's quarterly list of noncitable cases published in the Pacific Reporter and Montana Reports.

¶2 David Vincent Strachan (Strachan) appeals the denial of his motion to suppress entered in the First Judicial District Court, Lewis and Clark County.

¶3 On March 2, 2021, around 11:08 p.m., Officers Alex Nimmick and Dakota Becker stood on a sidewalk at the corner of East Sixth Avenue and North Davis Street in Helena, Montana, speaking with a pedestrian who stood just off the sidewalk in the street.

¶4 While speaking with the pedestrian, Officers Nimmick and Becker observed a white Toyota pickup truck—driven by Strachan—approaching them from the east on Sixth Avenue. The officers were in Strachan's line of sight as the truck's headlights were shining on them and the pedestrian. Officer Nimmick thought that "it looked like the [truck] was coming toward [the pedestrian]." Officer Becker believed that the truck was coming towards the officers as well.

¶5 As the truck reached the corner of Sixth Avenue and Davis Street, a second vehicle approached from the opposite direction on Sixth Avenue. Strachan braked, locking up the truck's brakes, apparently to prevent hitting the pedestrian. The truck screeched and skidded to a stop. Officer Becker's bodycam footage shows the truck coming to a stop

2

with the front of the truck just beyond where the pedestrian stood.  The second eastbound vehicle passed the intersection.

¶6      Despite no impact occurring, Officer Becker believed Strachan began braking too late because the truck nearly hit the pedestrian.  Officer Becker testified he believed Strachan's untimely braking might be due to a delayed reaction time, indicating impairment.

¶7      Strachan continued driving west on Sixth Avenue.  Within a half block, the officers observed the truck lock up its brakes again, apparently to avoid hitting a trash bin along the side of the road.  Once again, the officers heard the truck's tires skid.  The officers watched Strachan take a sharp turn into the parking lot of an apartment complex.  At this point, the officers decided to approach Strachan.  Strachan got out of the truck as the officers approached and Officer Nimmick observed that Strachan had a "staggering balance."  The officers confirmed Strachan's identity using his driver's license and began to question him.

¶8      Before questioning Strachan, Officer Nimmick noticed the smell of alcohol on Strachan's breath and observed Strachan had "bloodshot, watery eyes."  Officer Becker then asked Strachan if he was "good."  Strachan replied that he was "all right" and the pedestrian "just stepped out in front of [him]."  Strachan explained further, "I had a car coming the other way and the lights was in my eyes and all of the sudden I seen that guy coming out and I hit em'. . . I still got my studs on so."  Strachan refuted his brakes made the skidding noise, and instead stated that his studs made the sounds.  Next, Officer Becker asked Strachan if he had been drinking.  Strachan said, "No."

3

¶9 Officer Becker then asked Strachan where he was driving from. Strachan responded with inconsistent stories, first stating he had visited a friend in East Helena, then declaring he had visited his niece, her husband, and their baby. When Officer Becker asked Strachan if the officers could look at his eyes to make sure he could drive, Strachan responded, "No! Yeah, I do!" Strachan continued, "You know, I didn't do anything wrong though . . . there was a car coming the other way . . . ." Strachan told the officers he was "at home right now," but he actually lived on Holter Street—not near the alleyway where he stopped along Davis Street. Officer Becker testified Strachan eventually admitted he had been drinking. Nonetheless, Strachan allowed Officer Becker to look at Strachan's eyes again. Officer Becker confirmed that Strachan's eyes were "bloodshot" and "watery." During the investigation, the officers specifically explained to Strachan the indicators of impairment they noticed. Officer Becker testified that he told Strachan he braked too late and too hard, and that this type of driving behavior may indicate someone is driving under the influence.

¶10 Following their observations of Strachan's driving, his bloodshot and watery eyes, and the alcoholic odor coming from his breath, the officers asked Strachan to submit to Standardized Field Sobriety Tests (SFSTs). Strachan agreed to participate in the SFSTs but had difficulty walking and turning. The officers testified that Strachan's behavior during the SFSTs showed "multiple clues of impairment." When Officer Nimmick attempted to read Strachan the Preliminary Alcohol Screening Test Advisory, Strachan yelled at the officers and fled on foot. The officers pursued Strachan for about 15 minutes. While running away, Strachan threw an item over a fence. The officers later retrieved the item and identified it as a pill bottle containing methamphetamine. Once the officers

4

reached Strachan, they detained him and also recovered a methamphetamine smoking device on the ground under Strachan.

¶11 Over three hours later and upon obtaining a search warrant, Strachan's blood sample was drawn. The blood sample confirmed the presence of methamphetamine and tetrahydrocannabinol (THC) but showed no alcohol. Officer Nimmick believed that the three-hour delay likely "play[ed] a huge factor" in there being no alcohol in Strachan's blood.

¶12 On March 18, 2021, Strachan was charged by Information with five counts, including Driving While Under the Influence (7th), a felony (Count 1); Criminal Possession of Dangerous Drugs (methamphetamine), a felony (Count 2); Criminal Possession of Drug Paraphernalia, a misdemeanor (Count 3); Resisting Arrest, a misdemeanor (Count 4); Obstructing a Peace Officer, a misdemeanor (Count 5); and Tampering with Physical Evidence, a felony (Count 6). On June 11, 2021, Strachan moved to suppress all evidence obtained at the time of his arrest, arguing because Officers Becker and Nimmick lacked particularized suspicion to stop.

¶13 On November 22, 2021, the District Court held an evidentiary hearing and denied his motion in a written order entered December 7, 2021. Strachan pleaded guilty on January 20, 2022, to Counts 1 and 6, reserving his right to appeal the District Court's denial of his motion. The District Court committed Strachan to the Department of Corrections for four years on Count 1 and a consecutive four-year suspended sentence to the Montana State Prison on Count 6. Strachan appeals the denial of his Motion to Suppress.

5

¶14 We review a district court's grant or denial of a motion to suppress to determine whether the court's findings are clearly erroneous and whether those findings were applied correctly as a matter of law. *State v. Gill*, 2012 MT 36, ¶ 10, 364 Mont. 182, 272 P.3d 60. A finding of fact is clearly erroneous if it is not supported by substantial evidence, if the lower court misapprehended the effect of the evidence, or if this Court's review of the record leaves it with a definite and firm conviction that a mistake has been made. *City of Helena v. Brown*, 2017 MT 248, ¶ 7, 389 Mont. 63, 403 P.3d 341 (citations omitted). Substantial evidence is evidence that a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. *State v. Passwater*, 2015 MT 159, ¶ 9, 379 Mont. 372, 350 P.3d 382 (citing *State v. Aragon*, 2014 MT 89, ¶ 9, 379 Mont. 391, 321 P.3d 841).

¶15 As a threshold matter, we will not reweigh the District Court's factual findings regarding the officers' testimony and its evaluation of the bodycam video footage. On appeal, Strachan argues that we should not afford the District Court's factual findings deference and asks us to compare the testimony of the officers and the recorded events in the bodycam videos in "the exact same manner as did the District Court." This Court does not reweigh conflicting evidence or substitute its own evaluation of the evidence for that of the trial court. *State v. Wagner*, 2013 MT 159, ¶ 15, 370 Mont. 381, 303 P.3d 285. This Court defers to the trial court in cases involving conflicting evidence because it recognizes that the District Court had the benefit of observing the evidence and rendering a determination of the credibility of that evidence. *State v. Deines*, 2009 MT 179, ¶ 20, 351

6

Mont. 1, 208 P.3d 857. Additionally, we disagree with Strachan that the bodycam footage is dispositive in that it shows clear error in the District Court's findings.

¶16 Next, Strachan contends the officers lacked particularized suspicion to stop Strachan for questioning and the initial stop was unlawful under the totality of the circumstances because the investigative stop lasted longer than necessary to effectuate its purpose.[1] Strachan reasons that if his driving alone did not rise to the level of particularized suspicion to conduct SFSTs, then "it reasonably follows that his driving did not rise to the level of erratic driving that would justify a stop in the first place."

¶17 The State argues that the officers merely conducted a non-seizure encounter with Strachan that implicated no Fourth Amendment protection. The State contends that the totality of the circumstances shows that the officers here had an objective to check to see if Strachan was "okay" and did not restrain his liberty during the initial stop or "unreasonably invade Strachan's personal security." We agree.

¶18 Regardless of whether a seizure occurred when the officers approached Strachan and engaged him in conversation, we conclude the officers had particularized suspicion to detain Strachan after observing him nearly hit a pedestrian and garbage dumpster, make a sharp turn into the parking lot, and lose his balance when he got out of his truck. Law enforcement may constitutionally "stop a person or vehicle that is observed in circumstances that created a particularized suspicion that the person or the occupant of the

---

[1] In the trial court, Strachan only challenged the particularized suspicion for the administration of SFSTs. Here, and in addition, he challenges the particularized suspicion arising from the officers' observations of Strachan's driving behavior.

7

vehicle has committed, is committing, or is about to commit an offense." Section 46-5-401(1), MCA. However, an investigative stop "may not last longer than is necessary to effectuate the purpose of the stop." Section 46-5-403, MCA.

¶19 Whether particularized suspicion exists must be evaluated under the totality of circumstances, including the "quantity, or content, and quality, or degree of reliability of the information available to the officer." *State v. Pratt*, 286 Mont. 156, 161, 951 P.2d 37, 40 (1997); *City of Missoula v. Moore*, 2011 MT 61, ¶ 16, 360 Mont. 22, 251 P.3d 679. An inquiry into the subjective motivations of law enforcement for initiating a stop is inappropriate in assessing the validity of an arrest. *Brown*, ¶ 9. Rather, the focus is on objective data, such as "the time of day, the location of the stop, and the [person's] driving behavior." *Weer v. State*, 2010 MT 232, ¶ 10, 358 Mont. 130, 244 P.3d 311; *Brown*, ¶ 9.

¶20 In *Hulse v. DOJ, Motor Vehicle Div.*, 1998 MT 108, 289 Mont. 1, 961 P.2d 75, we held that a delayed reaction to pulling over after an officer has activated their headlights and sirens coupled with a failure to turn on the vehicle's headlights after dark resulted in particularized suspicion that the defendant committed an offense. *Hulse*, ¶ 38. We have also held that a delayed reaction of 25 seconds before proceeding from a flashing red light when there is not traffic on a Sunday morning supported particularized suspicion under the totality of the circumstances. *City of Missoula v. Cook*, 2001 MT 237, ¶¶ 13-15, 307 Mont. 39, 36 P.3d 414.

¶21 Also, in *State v. Trombley*, 2005 MT 174, 327 Mont. 507, 116 P.3d 771, we held that a vehicle making a legal U-turn combined with unsafe driving maneuvers, such as straddling the center line, drifting over the fog line, and failing to signal when changing

8

lanes, supported particularized suspicion for a traffic stop because these activities established sufficient "objective data from which the officer could make inferences" that the defendant "was engaged in some sort of wrongdoing." *Trombley*, ¶¶ 3, 4, 8, 10.

¶22 Here, the officers had particularized suspicion because of Strachan's "delayed response to seeing the pedestrian" and his sudden braking to avoid hitting a trash bin. Officer Becker explained Strachan slammed on his brakes and could have hit the pedestrian. Officer Becker explained further that Strachan's driving behavior is consistent—based on his training and experience—with an impaired driver with delayed reaction time. Officer Nimmick testified that "due to the time of night and observing that kind of driving behavior [was] concerning." The officers also observed Strachan make a "sharp turn" into the parking lot and that his balance was staggered as he exited his truck. This constitutes sufficient particularized suspicion for police to further investigate.

¶23 As the officers continued their investigation, they smelled alcohol on Strachan's breath and observed he had bloodshot and watery eyes. Strachan also gave inconsistent stories to the officers. Based on the totality of circumstances and our precedent, we conclude the District Court did not err when it determined there was particularized suspicion for the stop and to conduct SFSTs.

¶24 We also conclude that the officers did not unconstitutionally prolong their initial investigation. The officers had particularized suspicion Strachan was driving under the influence when they approached after two near traffic incidents and erratic driving behavior. As the officers here continued to investigate, they found objective data which provided sufficient cause to conduct SFSTs on Strachan. The objective data included:

9

(1) Strachan's delayed reaction time while driving, (2) the smell of alcohol on Strachan's breath, (3) Strachan's bloodshot and watery eyes, (4) Strachan's inconsistent statements about his travel, and (5) the time of night. The investigation here was a reasonable amount of time.

¶25 We have determined to decide this case pursuant to Section I, Paragraph 3(c) of our Internal Operating Rules, which provides for memorandum opinions. In the opinion of the Court, the case presents a question controlled by settled law or by the clear application of applicable standards of review.

¶26 Affirmed.

/S/ LAURIE McKINNON

We concur:

/S/ MIKE McGRATH
/S/ BETH BAKER
/S/ DIRK M. SANDEFUR
/S/ JIM RICE